**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW MEXICO**

IN RE:

**MBF INSPECTION SERVICES, INC.,**                                    **No. 18-11579-11**
      **Debtor.**

**JOINT STIPULATED MOTION FOR CREDIT AND/OR ADDITIONAL**
**USE OF CASH COLLATERAL ORDER ON EMERGENCY BASIS**
**UNDER 11 USC SECTION 364(c)**

COMES NOW, the Debtor-In-Possession, MBF Inspection Services, Inc. ("MBF"), by and through its counsel, Jennie D. Behles of B.L.F., LLC, and Inspection Leasing, Inc. ("ILI") by its counsel, Louis Puccini, Jr. of Robert D. Gorman, P.A., and seek Court authority pursuant to 11 USC §§ 105 and 364(c) and Rule 4001(c) FRBP and N.M. LBR 9013-1 to obtain emergency secured credit, grand adequate protection and collateralization to secured Lender ILI, and in support hereof joint movants state:

1.      The Debtor filed this case on June 22, 2018 and remains in possession of its assets and property.

2.      <u>The Nature of the Debtor's Business</u>.  The Debtor is engaged in the business of providing pipeline inspections to various industries in forty-one (41) states.

3.      <u>Unsecured Creditors' Committee</u>.  No unsecured creditors' committee has been appointed.

4.      <u>Cash Collateral</u>.  The Debtor has had in place since the beginning of the case financing through a Cash Collateral Order with ILI.  The Debtor has had a credit line with ILI for many years prior to the filing of this case, which is a revolving line of credit and has been used as an in and out line of credit on more or less an annual basis (demand note) collection of proceeds.  ILI has a pre-petition lien on the Debtor's cash collateral consisting of accounts receivable, work in progress, deposits, documents, general intangibles, and on other non-cash collateral, for purposes of securing said financing the line of credit loan from ILI.

5.      <u>Cash Collateral Order</u>.  The Court entered a Cash Collateral Order in this case on July 13, 2018 [Dkt. 26] which authorizes the use of cash collateral of this Lender, ILI, up to and including October 15, 2018 pursuant to the terms of the Promissory Note, Lending Agreement and Security Agreement which will be referenced in this motion (hereinafter collectively "ILI Loan").  The Court's Cash Collateral Order required the Debtor, MBF, to file this Motion to approve post-petition borrowing and repayment.

6.      <u>Reason for Borrowing</u>.  The Debtor carries substantial receivables and unbilled receivables which must, in order to be billed after the approval process from various third-party contractors before they can be paid by the entity to whom the Debtor has supplied inspectors on a contractual basis.  This substantially delays or defers the payment process.  One of the reasons that the Debtor has been successful in business is its ability to timely pay its inspectors regardless of their location and however remote the

location of the pipeline to be inspected. Without financing the Debtor loses this ability. Under the circumstances presently prevailing accounts receivable payment require third-party outside approval. The Debtor's average monthly cost of sales is approximately $4,500,000 including approximately $2,600,000 in salaries [*see* Budget, Dkt. 26-1]. Debtor does not always receive sufficient payments to meet its monthly expenses and ILI has for many years historically provided a line of credit.

7. <u>Plan Compensation</u>. It is expensive to adjust the borrower's various labor claims even though it is substantially less expensive than it would be in a non-Chapter 11 format. The Debtor, in this case, will be incurring litigation expenses in connection with expert witnesses, additional discovery of claimants, etc. How much more money the Debtor will need at any one time is difficult to calculate because one cannot precisely tell on what day deposits from receivable will be made, and one cannot precisely determine the net of any days' deposits including expert fees and professional fees, and persons involved in depositions and giving testimony as well as various economic experts.

8. <u>Non-Availability of Un-Secured Financing</u>. Debtor has made significant efforts to determine if Debtor could borrow post-petition funds in an unsecured fashion. The Debtor cannot, in the midst of this Chapter 11 proceeding, obtain any unsecured borrowing. Even though MBF had a pre-petition signed line of credit loan with Bank of The Southwest for $3.0M, Bank of the Southwest, even though it was MBF's long-standing bank, absolutely refused to make any pre-petition or post-petition loans to MBF and even refused to open a DIP bank account for MBF despite the Court's request. Valley Bank of Commerce has also refused to extend any further creditor as its loan is fully secured by a certificate of deposit. No commercial lender will make an unsecured or secured loan.

There is no indebtedness to Bank of The Southwest and its loan matured July 13, 2018 and it should release its lien.

There are no other liens on the cash collateral or Collateral.

9. <u>Use of Funds</u>. The Debtor plans on using any loan advances only for usual, customary and necessary business expenses all as outlined in the Cash Collateral Budget attached to the Cash Collateral Order [Dkt. 26] and Chapter 11 administrative expenses. There are no unusual or capital expenditures anticipated in the next year but there is an $800,000 insurance premium payment due in April, 2019.

10. <u>Repayment Provisions</u>. The line of credit loan from ILI is highly unusual in favor of MBF and very liberal in its repayment terms. The loan does not require any fixed principal repayments but only requires monthly interest only payments. The current monthly interest is approximately $12,000 per month and is current. The interest rate is 6% per annum. Historically, even prior to the current loan agreement, ILI has never demanded principal repayment but instead relies on MBF, the borrower, to make principal repayments in good faith from excess funds not needed to fund its current and near-term operations.

The Termination Date of the current Loan Agreement is May 31, 2019 but may be extended in Lender's sole discretion.

It is almost always required by commercial lenders (banks) that significant principal repayments are made during the term of a line of credit loan before the maturity date. It is extremely favorable to the borrower, MBF, that it is not required to do so under the credit loan from ILI which is the subject of this Motion,

11. <u>Protection of Collateral</u>. The Debtor is concerned that without these funds the Debtor will not be able to successfully operate its business, propose and confirm its Plan and handle the claims process in this case. The Debtor has prepared a proposed budget, attached hereto as <u>Exhibit A</u>, which was provided to the Lender (over the Cash Collateral Budget).

a. The Debtor will continue to collect receivables in the normal course of business and reduce the indebtedness per Exhibit all provided to the Lender. *See* <u>Exhibit B</u>.

12. <u>Emergency Requirements</u>. The Debtor is currently in the process of meeting with counsel to determine the best claims process and to begin preparing its Plan as well as attempting to streamline third-party collection process in the Chapter 11.

13. <u>Proposed Collateral</u>. The entire loan from ILI, both pre-petition and post-petition including future advances, would be secured by a perfected lien on all of MBF's furniture, fixtures and equipment, accounts and contracts receivable, contract rights, general intangibles, inventory, insurance proceeds, all proceeds and all other collateral described in the Security Agreement, Financing Statement and loan documents (herein "Collateral") attached <u>Exhibit B</u>. The Debtor's current accounts receivable are approximately $4.6M and estimates that if MBF ceased business the accounts receivable would have a current value of less than that amount.

14. <u>Other Liens</u>. Other than the Certificate of Deposit on which the Valley Bank of Commerce has a lien and set off rights, the equipment and vehicles leased from ILI and the Collateral secured to ILI, MBF has virtually no other assets. If the general unsecured creditors are to receive payment in a confirmed Chapter 1 Plan the only source of funds is from business income from future ongoing business. MBF believes it can only continue in business if it received periodic draws as needed on its line of credit from ILI.

15. <u>Proposed Order and Credit Agreement</u>. The Debtor seeks an order substantially conforming to the proposed order, <u>Exhibit C</u> attached hereto, which authorizes the Debtor to:

a. Obtain secured post-petition financing in an amount not to exceed a total of $5M from Lender on the terms and conditions set fort in the Order and the Loan Documents attached as <u>Exhibit B</u>;

b.      Grants Lender a legally enforceable perfected lien on the pre and post collateral to grant Lender additional adequate protection pursuant to the terms of the cash collateral Orders as may be modified from time to time;

c.      Grant Lender an administrative claim under 364(c), 503(b) and 507(b);

d.      MBF leases virtually all of its equipment, office furniture and vehicles from ILI pursuant to a separate Equipment Lease dated September 25, 2009 as Amended, September 25, 2014, which will be assumed pursuant to 11 USC §365;

e.      Lenders shall be provided adequate protection by cross-security on the Equipment Lease and the Equipment Lease shall be assumed pursuant to 11 USC § 365;

f.      The proposed Credit Order does not otherwise modify code provisions or automatic stay rules except as stated in the default provision; does not modify any entities right to file a plan or deadlines to file a plan; for approval of a disclosure statement or entry of a confirmation order; modify any non-bankruptcy law relating to lien perfection or foreclosure; does not modify any claim or cause of action or statute of limitation of the trustee or estate; provide for any indemnification; and does not provide for a lien on any causes of action under 11 USC §§ 544, 545, 575, 548, 549,553(b0, 723(a) and 724(a);

g.      Debtor and its successors and no other party may dispute lender's secured claim pursuant to 11 USC § 506(c);

h.      The Order does limit rights under 11 USC § 506(c);

i.      <u>Default Provisions</u>. The Lender, ILI, would be subject to the automatic stay and if a default occurred in the Loan Agreement or Equipment Lease, Lender would be required to give Borrower (MBF) fifteen (15) days' notice of default and right to cure prior to initiating a stay motion or other default remedies;

j.      MBF shall not factor its accounts receivable; and

k.      ILI's pre-petition lien is deemed valid perfected for all purposes and the Debtor, Estate and all successors to the Debtor or entities acting on behalf of the Debtor including, but not limited to a reorganized debtor, trustee (Chapter 7 or Chapter 11 Trustee), examiner, and creditors' committee are precluded from pursuing any claims against the Lender to modify Lender's pre-petition lien and the priority of such lien on the "Collateral" pursuant to 11 USC §§ 544, 545, 547, 548, 549, 553(b), 723(a) and 724(a);

16.      <u>Taxes</u>. MBF owes no taxes and all tax returns due have been filed and all taxes paid.

17.      <u>Applicable Provisions Identified in Rule 4001(C)(1)(B)</u>. This motion is made in accordance with Bankruptcy Rule 4001(C)(1)(a) in that the motion is made in accordance with Bankruptcy Rule 9014 as accompanied by a copy of the Credit Agreement and the proposed form of order. The motion is not more than five (5) pages in length. The Credit Agreement is attached as <u>Exhibit D</u> to the motion.

The form of order is attached to the motion as <u>Exhibit C</u>. All provisions of the order would be proposed to remain in effect if the Motion is granted.

18.    <u>Notice Period</u>. The Court has set a period of time for filing objections in fourteen (14) days, plus three (3) days for mailing, and may hold a preliminary hearing upon the expiration of that time. If an objection is filed, or if the Court determines that a hearing is appropriate, the Court shall schedule a final hearing.

19.    The Debtor, MBF Inspection Services, Inc., requests the waiver of Rule 6004(h) FRBP, if applicable, staying the order to incur credit for fourteen (14) days after entry.

Respectfully submitted,

**B.L.F., LLC**
/s/ *Jennie Deden Behles*
Jennie Deden Behles
P.O. Box 7070
Albuquerque, NM  87106
T. (505) 242-7004 / F. (505) 242-7066
E.  jennie@jdbehles.com
*Attorney for Debtor*

<u>**CERTIFICATE OF SERVICE**</u>

In accordance with FRBP 9036, NM LBR 9036-1(b) LBR 6006-1 and FRCP 5(b)(3), I hereby certify that service of this document was made on July 20, 2018, via the notice transmission facilities of the case management and electronic filing system of the United States Bankruptcy Court for the District of New Mexico on all parties or counsel requesting notice to be served by electronic means.

Leonard Martinez-Metzgar
United States Trustee
P.O. Box 608
Albuquerque, NM  87103
E. leonard.martnez-metzgar@usdoj.gov

Louis Puccini, Jr.
Robert D. Gorman, P.A.
P.O. Box 25164
Albuquerque, NM  87125-0164
E. louis@rdgormanlaw.com
*Attorney for Inspection Leasing, Inc.*

**B.L.F., LLC**
/s/ *filed electronically*
Jennie Deden Behles

**MBF Inspection Services, Inc.** [1]
**Cash Flow Budget/Projection** [1]
For the Twelve Months Ended June 30, 2019
As of: July 19, 2018

| | Budgeted July | Budgeted August | Budgeted September | Budgeted October | Budgeted November | Budgeted December | Budgeted January | Budgeted February | Budgeted March | Budgeted April | Budgeted May | Budgeted June | Twelve Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts from operations** | | | | | | | | | | | | | |
| Sales receipts | 4,600,000 | 4,800,000 | 4,900,000 | 4,900,000 | 4,900,000 | 5,000,000 | 4,600,000 | 4,600,000 | 4,600,000 | 4,800,000 | 4,800,000 | 4,800,000 | 57,300,000 |
| Other operating receipts | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total receipts from operations** | 4,600,000 | 4,800,000 | 4,900,000 | 4,900,000 | 4,900,000 | 5,000,000 | 4,600,000 | 4,600,000 | 4,600,000 | 4,800,000 | 4,800,000 | 4,800,000 | 57,300,000 |
| **Cost of sales disbursements** | | | | | | | | | | | | | |
| Per diem | 1,075,000 | 1,100,000 | 1,125,000 | 1,125,000 | 1,125,000 | 1,150,000 | 1,075,000 | 1,075,000 | 1,075,000 | 1,100,000 | 1,100,000 | 1,100,000 | 13,225,000 |
| Mileage | 275,000 | 300,000 | 325,000 | 325,000 | 325,000 | 350,000 | 275,000 | 275,000 | 275,000 | 300,000 | 300,000 | 300,000 | 3,625,000 |
| Field labor net pay | 1,800,000 | 1,850,000 | 1,900,000 | 1,900,000 | 1,900,000 | 1,950,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,850,000 | 1,850,000 | 1,850,000 | 22,250,000 |
| Payroll taxes, employee & employer | 660,000 | 685,000 | 700,000 | 700,000 | 700,000 | 715,000 | 660,000 | 660,000 | 660,000 | 685,000 | 685,000 | 685,000 | 8,195,000 |
| Employee benefits, employee & employer | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 225,000 | 2,700,000 |
| Insurance | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 900,000 | 7,500 | 7,500 | 982,500 |
| Reimbursable expenses | 100,000 | 110,000 | 120,000 | 120,000 | 120,000 | 130,000 | 100,000 | 100,000 | 100,000 | 110,000 | 110,000 | 110,000 | 1,330,000 |
| Non-billable reimbursed expenses | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Contract labor | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Drug testing, safety, & training costs | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 300,000 |
| **Total cost of sales** | 4,168,500 | 4,303,500 | 4,428,500 | 4,428,500 | 4,428,500 | 4,553,500 | 4,168,500 | 4,168,500 | 4,168,500 | 5,196,000 | 4,303,500 | 4,303,500 | 52,619,500 |
| **Net cash provided by/(used in) direct operations** | 431,500 | 496,500 | 471,500 | 471,500 | 471,500 | 446,500 | 431,500 | 431,500 | 431,500 | (396,000) | 496,500 | 496,500 | 4,680,500 |
| **Other operating expense disbursements** | | | | | | | | | | | | | |
| Advertising | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Bank charges | - | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 1,650 |
| Car & truck expense | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Donations | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 3,600 |
| Dues & subscriptions | 1,000 | 2,000 | 2,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 2,000 | 1,000 | 1,000 | 2,000 | 16,000 |
| Employee benefits, employee & employer | 19,000 | 20,000 | 19,000 | 19,000 | 19,000 | 19,000 | 18,000 | 18,000 | 17,000 | 17,000 | 17,000 | 17,000 | 219,000 |
| Interest | 15,750 | 15,750 | 15,750 | 15,750 | 15,750 | 15,750 | 15,750 | 15,750 | 15,750 | 15,750 | 15,750 | 15,750 | 189,000 |
| Legal and professional fees | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 180,000 |
| Meals and entertainment | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 180,000 |
| Office expense | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 18,000 |
| Penalties | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Rent | 20,960 | 20,960 | 20,960 | 20,960 | 20,960 | 20,960 | 20,960 | 20,960 | 20,960 | 20,960 | 20,960 | 20,960 | 251,520 |
| Repairs & maintenance | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Salaries & wages net pay | 80,000 | 120,000 | 80,000 | 80,000 | 75,000 | 75,000 | 70,000 | 70,000 | 65,000 | 65,000 | 65,000 | 65,000 | 910,000 |
| Supplies | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 |
| Taxes, employee & employer | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 720,000 |
| Telephone | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 |
| Travel | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 |
| Utilities | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 42,000 |
| **Total other operating expense disbursements** | 228,760 | 269,910 | 229,910 | 228,910 | 223,910 | 224,910 | 217,910 | 217,910 | 212,910 | 211,910 | 211,910 | 212,910 | 2,691,770 |
| **Net cash provided by/(used in) operating activities** | 202,740 | 226,590 | 241,590 | 242,590 | 247,590 | 221,590 | 213,590 | 213,590 | 218,590 | (607,910) | 284,590 | 283,590 | 1,988,730 |
| **Other receipts & (disbursements)** | | | | | | | | | | | | | |
| Proceeds from disposals of assets | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest received | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Dividends received | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Miscellaneous receipts | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Rental receipts | 350 | 350 | 350 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 1,500 |
| Utilities | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Miscellaneous & other disbursements | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total other receipts & (disbursements)** | 350 | 350 | 350 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 1,500 |

1 - This is our best estimate based on our expectations for maintaining a consistent book of work for the next 12 months. There could be significant variances in many of the categories, particularly the payroll, payroll taxes, and benefits estimates because it's hard to estimate when slow downs, or speed ups, of work will occur, as well as other factors hard to project the timing of...

Exhibit A

**MBF Inspection Services, Inc.**
**Cash Flow Budget/Projection**
**For the Twelve Months Ended June 30, 2019**
**As of:   July 19, 2018**

| | Budgeted July | Budgeted August | Budgeted September | Budgeted October | Budgeted November | Budgeted December | Budgeted January | Budgeted February | Budgeted March | Budgeted April | Budgeted May | Budgeted June | Twelve Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net increase/(decrease) before Chapter 11 disbursements | 203,090 | 226,940 | 241,940 | 242,640 | 247,640 | 221,640 | 213,640 | 213,640 | 218,640 | (607,860) | 284,640 | 283,640 | 1,990,230 |
| **Chapter 11 administrative cost and expense disbursements** | | | | | | | | | | | | | |
| Legal fees | - | 50,000 | 25,000 | 20,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 4,000 | 134,000 |
| Administration & trustee costs | 325 | | | 13,000 | | | 13,000 | | | 13,000 | | | 39,325 |
| **Total chapter 11 cost & expense disbursements** | 325 | 50,000 | 25,000 | 33,000 | 5,000 | 5,000 | 18,000 | 5,000 | 5,000 | 18,000 | 5,000 | 4,000 | 173,325 |
| **Receipts/(disbursements) from financing activities** | | | | | | | | | | | | | |
| Common paymaster receipts from related party | - | - | 3,000 | - | - | 3,000 | - | - | 3,000 | - | - | 3,000 | 12,000 |
| Receipts from line of credit | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Receipts from bank loans | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Principal payments on line of credit | - | - | (250,000) | - | - | - | (300,000) | - | - | (300,000) | - | (300,000) | (1,150,000) |
| Principal payments on bank loans | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net cash provided by/(used in) financing activities** | - | - | (247,000) | - | - | 3,000 | (300,000) | - | 3,000 | (300,000) | - | (297,000) | (1,138,000) |
| **Net cash provided by/(used) by company** | 202,765 | 176,940 | (30,060) | 209,640 | 242,640 | 219,640 | (104,360) | 208,640 | 216,640 | (925,860) | 279,640 | (17,360) | 678,905 |

Exhibit A

# SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of May 31, 2018 (as amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "**Agreement**"), made by and among MBF Inspections Services Inc., [BORROWER], a [New a New Mexico Corporation (the "**Grantor**"), in favor of Inspection Leasing Inc. as Secured Party [NAME OF LENDER], (the "**Secured Party**").

WHEREAS, on the date hereof, the Secured Party has made [and may make] loans to the Grantor in an aggregate unpaid principal amount not exceeding $5,000,000 (the "**Loans**"), evidenced by that certain Revolving Line of Credit Promissory Note of even date herewith (as amended, supplemented or otherwise modified from time to time, the "**Loan Agreement**") made by the Grantor and payable to the order of the Secured Party. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Loan Agreement];

WHEREAS, this Agreement is given by the Grantor in favor of the Secured Party to secure the payment and performance of all of the Secured Obligations; and

WHEREAS, it is a condition to the obligations of the Lender to make the Loans under the Loan Agreement that the Grantor execute and deliver this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  Definitions.

    (a)   Unless otherwise specified herein, all references to Sections and Schedules herein are to Sections and Schedules of this Agreement.

    (b)   Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9.

    (c)   For purposes of this Agreement, the following terms shall have the following meanings:

    "**Collateral**" has the meaning set forth in Section 2.

    "**Event of Default**" [has the meaning set forth in the Loan Agreement].

    "**First Priority**" means, with respect to any lien and security interest purported to be created in any Collateral pursuant to this Agreement, such lien and security interest is the most senior lien to which such Collateral is subject (subject only to liens permitted under the Loan Agreement).

    "**Perfection Certificate**" has the meaning set forth in Section 5.

**"Proceeds"** means "proceeds" as such term is defined in section 9-102 of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Collateral, collections thereon or distributions with respect thereto.

**"Secured Obligations"** has the meaning set forth in Section ▮.

**"UCC"** means the Uniform Commercial Code as in effect from time to time in the State of [New Mexico] or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

2.      Grant of Security Interest. The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of its right, title and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired (collectively, the **"Collateral"**) subordinate only to the Claim of the Bank of the Southwest, if any, or Valley Bank of Commerce.

(a)      all fixtures and personal property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money; and

(b)      all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing.

3.      Secured Obligations. The Collateral secures the due and prompt payment and performance of:

(a)      the obligations of the Grantor from time to time arising under the Loan Agreement, this Agreement or otherwise with respect to the due and prompt payment of (i) the principal of and premium, if any, and interest on the Loans (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, attorneys' fees and disbursements, reimbursement obligations, contract causes of action, expenses and indemnities, whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy,

insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Grantor under or in respect of the Loan Agreement and this Agreement; and

(b)     all other covenants, duties, debts, obligations and liabilities of any kind of the Grantor under or in respect of the Loan Agreement, this Agreement or any other document made, delivered or given in connection with any of the foregoing, in each case whether evidenced by a note or other writing, whether allowed in any bankruptcy, insolvency, receivership or other similar proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (all such obligations, covenants, duties, debts, liabilities, sums and expenses set forth in Section ▮ being herein collectively called the **"Secured Obligations"**).

4.     Perfection of Security Interest and Further Assurances.

(a)     The Grantor shall, from time to time, as may be required by the Secured Party with respect to all Collateral, immediately take all actions as may be requested by the Secured Party to perfect the security interest of the Secured Party in the Collateral, including, without limitation, with respect to all Collateral over which control may be obtained within the meaning of sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, [section 201 of the federal Electronic Signatures in Global and National Commerce Act and, as the case may be, section 16 of the Uniform Electronic Transactions Act,] as applicable, the Grantor shall immediately take all actions as may be requested from time to time by the Secured Party so that control of such Collateral is obtained and at all times held by the Secured Party. All of the foregoing shall be at the sole cost and expense of the Grantor.

(b)     The Grantor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by the Grantor, or words of similar effect. The Grantor agrees to provide all information required by the Secured Party pursuant to this Section promptly to the Secured Party upon request.

(c)     If the Grantor shall at any time hold or acquire any certificated securities, promissory notes, tangible chattel paper, negotiable documents or warehouse receipts relating to the Collateral, the Grantor shall [immediately] endorse, assign and deliver the same to the Secured Party, accompanied by such instruments of transfer or assignment duly executed in blank as the Secured Party may from time to time specify.

(d)     If any Collateral is at any time in the possession of a bailee, the Grantor shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to the Secured Party, that the bailee holds such Collateral for the benefit of the Secured Party and the bailee agrees to comply, without further consent of the Grantor, at any time with instructions of the Secured Party as to such Collateral.

(e)     The Grantor agrees that at any time and from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that the Secured Party may [reasonably] request, in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral.

5.      Representations and Warranties. The Grantor represents and warrants as follows:

(a)     It has previously delivered to the Secured Party a certificate signed by the Grantor and entitled "Perfection Certificate" ("**Perfection Certificate**"), and that: (i) the Grantor's exact legal name is that indicated on the Perfection Certificate and on the signature page hereof, (ii) the Grantor is an organization of the type, and is organized in the jurisdiction, set forth in the Perfection Certificate, (iii) the Perfection Certificate accurately sets forth [the Grantor's organizational identification number (or accurately states that the Grantor has none),] the Grantor's place of business (or, if more than one, its chief executive office), and its mailing address, (iv) all other information set forth on the Perfection Certificate relating to the Grantor is accurate and complete and (v) there has been no change in any such information since the date on which the Perfection Certificate was signed by the Grantor.

(b)     All information set forth on the Perfection Certificate relating to the Collateral is accurate and complete and there has been no change in any such information since the date on which the Perfection Certificate was signed by the Grantor.

(c)     The Collateral consisting of securities have been duly authorized and validly issued, and are fully paid and non-assessable and subject to no options to purchase or similar rights.] [The Grantor holds no commercial tort claims except as indicated on Schedule 1. None of the Collateral constitutes, or is the proceeds of, (i) farm products, (ii) as-extracted collateral, (iii) manufactured homes, (iv) health-care-insurance receivables, (v) timber to be cut, (vi) aircraft, aircraft engines, satellites, ships or railroad rolling stock. None of the account debtors or other persons obligated on any of the Collateral is a governmental authority covered by the Federal Assignment of Claims Act or like federal, state or local statute or rule in respect of such Collateral.

(d)     At the time the Collateral becomes subject to the lien and security interest created by this Agreement, the Grantor will be the sole, direct, legal and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option or right

of others except for the security interest created by this Agreement and other liens permitted by the Loan Agreement.

(e)     The pledge of the Collateral pursuant to this Agreement creates a valid and perfected First Priority security interest in the Collateral, securing the payment and performance when due of the Secured Obligations.

(f)     It has full power, authority and legal right to borrow the Loans and pledge the Collateral pursuant to this Agreement.

(g)     Each of this Agreement and the Loan Agreement has been duly authorized, executed and delivered by the Grantor and constitutes a legal, valid and binding obligation of the Grantor enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law).

(h)     No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the borrowing of the Loans and the pledge by the Grantor of the Collateral pursuant to this Agreement or for the execution and delivery of the Loan Agreement and this Agreement by the Grantor or the performance by the Grantor of its obligations thereunder.

(i)     The execution and delivery of the Loan Agreement and this Agreement by the Grantor and the performance by the Grantor of its obligations thereunder, will not violate any provision of any applicable law or regulation or any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Grantor or any of its property, or the organizational or governing documents of the Grantor or any agreement or instrument to which the Grantor is party or by which it or its property is bound.

(j)     The Grantor has taken all action required on its part for control (as defined in sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, [section 201 of the federal Electronic Signatures in Global and National Commerce Act and, as the case may be, section 16 of the Uniform Electronic Transactions Act,] as applicable) to have been obtained by the Secured Party over all Collateral with respect to which such control may be obtained pursuant to the UCC. No person other than the Secured Party has control or possession of all or any part of the Collateral.

6.     Voting, Distributions and Receivables.

(a)     The Secured Party agrees that unless an Event of Default shall have occurred and be continuing, the Grantor may, to the extent the Grantor has such right as a holder of the Collateral consisting of securities, other Equity Interests or indebtedness owed by any obligor, vote and give consents, ratifications and waivers with respect thereto, except to the extent that, in the Secured Party's reasonable judgment, any such vote, consent, ratification or waiver could/would] detract from the value thereof as Collateral or which could/would be inconsistent with or result in any violation of any

provision of the Loan Agreement or this Agreement[, and from time to time, upon request from the Grantor, the Secured Party shall deliver to the Grantor suitable proxies so that the Grantor may cast such votes, consents, ratifications and waivers].

(b) [The Secured Party agrees that the Grantor may, unless an Event of Default shall have occurred and be continuing, receive and retain all [cash] dividends and other distributions with respect to the Collateral consisting of securities, other Equity Interests or indebtedness owed by any obligor.]

(c) [If any Event of Default shall have occurred and be continuing,] The Secured Party may, or at the request and option of the Secured Party the Grantor shall, notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to the Secured Party.

7.     Covenants. The Grantor covenants as follows:

(a) The Grantor will not, without providing at least [30] days' prior written notice to the Secured Party, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business or its organizational identification number. The Grantor will, prior to any change described in the preceding sentence, take all actions [reasonably] requested by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(b) The Collateral, to the extent not delivered to the Secured Party pursuant to Section ▮, will be kept at those locations listed on the Perfection Certificate and the Grantor will not remove the Collateral from such locations without providing at least [30] days' prior written notice to the Secured Party. The Grantor will, prior to any change described in the preceding sentence, take all actions [reasonably] required by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(c) The Grantor shall, at its own cost and expense, defend title to the Collateral and the First Priority lien and security interest of the Secured Party therein against the claim of any person claiming against or through the Grantor and shall maintain and preserve such perfected First Priority security interest for so long as this Agreement shall remain in effect.

(d) The Grantor will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein[ except as expressly provided for [in the Loan Agreement/herein or with the prior written consent of the Secured Party].

(e) The Grantor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon. The Grantor will

permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located.

(f) The Grantor will pay promptly when due all taxes, assessments, governmental charges, and levies upon the Collateral or incurred in connection with the use or operation of the Collateral or incurred in connection with this Agreement.

8. Secured Party Appointed Attorney-in-Fact. The Grantor hereby appoints the Secured Party the Grantor's attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time during the continuance of an Event of Default] in the Secured Party's discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement (but the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.

9. Secured Party May Perform. If the Grantor fails to perform any obligation contained in this Agreement, the Secured Party may itself perform, or cause performance of, such obligation, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor; provided that the Secured Party shall not be required to perform or discharge any obligation of the Grantor.

10. Reasonable Care. The Secured Party shall have no duty with respect to the care and preservation of the Collateral beyond the exercise of reasonable care. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property, it being understood that the Secured Party shall not have any responsibility for (a) ascertaining or taking action with respect to any claims, the nature or sufficiency of any payment or performance by any party under or pursuant to any agreement relating to the Collateral or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral. Nothing set forth in this Agreement, nor the exercise by the Secured Party of any of the rights and remedies hereunder, shall relieve the Grantor from the performance of any obligation on the Grantor's part to be performed or observed in respect of any of the Collateral.

11. Remedies Upon Default.

(a) If any Event of Default shall have occurred and be continuing, the Secured Party, without any other notice to or demand upon the Grantor, may assert all rights and remedies of a secured party under the UCC or other applicable law, including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate or dispose of all or any portion of the Collateral. If notice prior to disposition of the Collateral or any portion thereof is necessary under applicable law, written notice mailed to the Grantor at its notice address as provided in Section ⬛ hereof ten days prior to the date of such disposition shall constitute reasonable

notice, but notice given in any other reasonable manner shall be sufficient. So long as the sale of the Collateral is made in a commercially reasonable manner, the Secured Party may sell such Collateral on such terms and to such purchaser(s) as the Secured Party in its absolute discretion may choose, without assuming any credit risk and without any obligation to advertise or give notice of any kind other than that necessary under applicable law. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of similar property. [At any sale of the Collateral, if permitted by applicable law, the Secured Party may be the purchaser, licensee, assignee or recipient of the Collateral or any part thereof and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such sale.] To the extent permitted by applicable law, the Grantor waives all claims, damages and demands it may acquire against the Secured Party arising out of the exercise by it of any rights hereunder. The Grantor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security for the Secured Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Secured Party or any custodian may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Secured Party nor any custodian shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action whatsoever with regard thereto. [The Grantor agrees that it would not be commercially unreasonable for the Secured Party to dispose of the Collateral or any portion thereof by utilizing internet sites that provide for the auction of assets of the type included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets. The Secured Party shall not be obligated to clean-up or otherwise prepare the Collateral for sale.

(b)    [If any Event of Default shall have occurred and be continuing, all rights of the Grantor to (i) exercise the voting and other consensual rights it would otherwise be entitled to exercise pursuant to Section 6██ and (ii) receive the dividends and other distributions which it would otherwise be entitled to receive and retain pursuant to Section 6██, shall immediately cease, and all such rights shall thereupon become vested in the Secured Party, which shall have the sole right to exercise such voting and other consensual rights and receive and hold such dividends and other distributions as Collateral.]

(c)    If any Event of Default shall have occurred and be continuing, any cash held by the Secured Party as Collateral and all cash Proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in whole or in part by the Secured Party to the payment of expenses incurred by the Secured Party in connection with the foregoing or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Party hereunder, including reasonable attorneys' fees, and the

balance of such proceeds shall be applied or set off against all or any part of the Secured Obligations in such order as the Secured Party shall elect. Any surplus of such cash or cash Proceeds held by the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus. The Grantor shall remain liable for any deficiency if such cash and the cash Proceeds of any sale or other realization of the Collateral are insufficient to pay the Secured Obligations and the fees and other charges of any attorneys employed by the Secured Party to collect such deficiency.

(d)    If the Secured Party shall determine to exercise its rights to sell all or any of the Collateral pursuant to this Section, the Grantor agrees that, upon request of the Secured Party, the Grantor will, at its own expense, do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding and in compliance with applicable law.

12.    No Waiver and Cumulative Remedies. The Secured Party shall not by any act (except by a written instrument pursuant to Section ▉), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

13.    [SECURITY INTEREST ABSOLUTE. The Grantor hereby waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description. All rights of the Secured Party and liens and security interests hereunder, and all Secured Obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:

(a)    any illegality or lack of validity or enforceability of any Secured Obligation or any related agreement or instrument;

(b)    any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any rescission, waiver, amendment or other modification of the Loan Agreement, this Agreement or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

(c)    any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver or other modification of any guaranty, for all or any of the Secured Obligations;

(d)    any manner of sale, disposition or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations;

(e)    any default, failure or delay, wilful or otherwise, in the performance of the Secured Obligations;

(f) any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, the Grantor against the Secured Party; or

(g) any other circumstance (including, without limitation, any statute of limitations) or manner of administering the Loans or any existence of or reliance on any representation by the Secured Party that might vary the risk of the Grantor or otherwise operate as a defense available to, or a legal or equitable discharge of, the Grantor or any other grantor, guarantor or surety.]

14. Amendments. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated or waived, and no consent to any departure by the Grantor therefrom shall be effective unless the same shall be in writing and signed by the Secured Party and the Grantor, and then such amendment, modification, supplement, waiver or consent shall be effective only in the specific instance and for the specific purpose for which made or given.

15. Addresses For Notices. All notices and other communications provided for in this Agreement shall be in writing and shall be given in the manner and become effective as set forth in the Loan Agreement, and addressed to the respective parties at their addresses as specified on the signature pages hereof or as to either party at such other address as shall be designated by such party in a written notice to each other party.

16. Continuing Security Interest; Further Actions. This Agreement shall create a continuing First Priority lien and security interest in the Collateral and shall (a) subject to Section ▇, remain in full force and effect until payment and performance in full of the Secured Obligations, (b) be binding upon the Grantor, its successors and assigns, and (c) inure to the benefit of the Secured Party and its successors, transferees and assigns; provided that the Grantor may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party. [Without limiting the generality of the foregoing clause (c), any assignee of the Secured Party's interest in any agreement or document which includes all or any of the Secured Obligations shall, upon assignment [in accordance with Section [ASSIGNMENTS] of the Loan Agreement], become vested with all the benefits granted to the Secured Party herein with respect to such Secured Obligations.]

17. Termination; Release. On the date on which all Secured Obligations have been paid and performed in full, the Secured Party will, at the request and sole expense of the Grantor, (a) duly assign, transfer and deliver to or at the direction of the Grantor (without recourse and without any representation or warranty) such of the Collateral as may then remain in the possession of the Secured Party, together with any monies at the time held by the Secured Party hereunder, and (b) execute and deliver to the Grantor a proper instrument or instruments acknowledging the satisfaction and termination of this Agreement.

18. GOVERNING LAW. This Agreement [and the Loan Agreement] and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement [or the Loan Agreement (except, as to the Loan Agreement, as expressly set forth therein)] and the transactions contemplated hereby and thereby

shall be governed by, and construed in accordance with, the laws of the State of [STATE]. The other provisions of Sections [GOVERNING LAW; JURISDICTION; ETC.] and [WAIVER OF JURY TRIAL] of the Loan Agreement are incorporated herein, mutatis mutandis, as if a part hereof.

19. Counterparts. This Agreement and any amendments, waivers, consents or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement [and the Loan Agreement] constitute the entire contract among the parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

MBF Inspection Services Inc., as Grantor

By _____

Name:  Frank Sturges

Title:  President

Address for Notices: P.O. Box 2428, Roswell, NM 88201

Inspection Leasing Inc. as Secured Party

By _Mark W. Daniels_

Name: Mark W. Daniels

Title:   President

Address for Notices:  805 N Richardson Ave., Roswell, New Mexico, 88201-4920

# OFFICE OF THE NEW MEXICO SECRETARY OF STATE

■

■

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

**ELECTRONICALLY FILED**
Office of the New Mexico Secretary of State
IFS Number: 20180065037G
Filing Number: 20180065037G
Filed on: 06/06/2018 05:38 PM
Total Number of Pages: 2

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |
| **SHAKARA3 5054007320** |

| B. E-MAIL CONTACT AT FILER (optional) |
| --- |
| **jennie@jdbehles.com** |

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

> **MARK DANIELS**
> **805 N. RICHARDSON, INSPECTION LEASING INC.**
> **ROSWELL, NM 88201 USA**

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

|  | 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|---|
| | **MBF LEASING SERVICES INC** | | | | | |
| OR | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| | | | | | | |
| | 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| | **P.O.BOX 2428** | **ROSWELL** | **NM** | **88202** | | **UNITED STATES** |

|  | 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| OR | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| | | | | | | |
| | 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| | | | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

|  | 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|---|
| | **INSPECTION LEASING INC** | | | | | |
| OR | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| | | | | | | |
| | 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| | **805 N. RICHARDSON** | **ROSWELL** | **NM** | **88201** | | **UNITED STATES** |

4. COLLATERAL: This financing statement covers the following collateral:
All of Debtors furniture, fixtures & equipment, accounts and contracts receivable, contract rights and general intangibles, inventory and all profits and proceeds therefrom subordinate to the prior liens of Bank of the Southwest and Valley Bank of Commerce

5. Check only if applicable and check only one box: **Collateral is**

held in a Trust (see UCC1Ad, item 17 and Instructions)

being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box: |
| --- | --- |
| Public-Finance Transaction | Agricultural Lien |
| Manufactured-Home Transaction | Non-UCC Filing |
| A Debtor is a Transmitting Utility | |

7. ALTERNATIVE DESIGNATION (if applicable):

Lessee/Lessor     Consignee/Consignor     Seller/Buyer     Bailee/Bailor     Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

Exhibit B

## REVOLVING LINE OF CREDIT PROMISSORY NOTE

May 31, 2018

For value received, MBF Inspection Services, Inc, a New Mexico corporation (the "Borrower"), of 805 Richardson, PO Box 2428, Roswell, New Mexico 88201, hereby promises to pay to the order of Inspection Leasing ,Inc, a [*New Mexico*] corporation (the "Lender"), of [*805 N. Richardson, *],[*P.O. Box 2428*],[*Roswell,],[*New Mexico 88201*], or at such other address as the holder hereof may designate, the principal sum of $5,000,000.00, or the aggregate unpaid principal amount of all advances made by the Lender to the Borrower hereunder, whichever is less, in lawful money of the United States. This Note evidences the Borrower's indebtedness under a revolving Line of Credit with the Lender not to exceed $5,000.000.00. During the period from the date hereof until the Termination Date (as hereafter defined), the Lender shall make advances thereunder and the Borrower may borrow, repay and reborrow; provided, however, that the aggregate amount of all advances at any one time outstanding shall not exceed the amount of $5,000,000.00 and provided, further, that the Lender's obligation to make advances and the Borrower's right to borrow, repay and reborrow are subject to the terms, conditions and limitations contained in this Note and the Loan Agreement (as hereafter defined). If any advances are made during the period from the date hereof until the anniversary of the date hereof (as such date may be extended, in writing from time to time, in the Lender's sole and absolute discretion, the "Termination Date"), the outstanding principal balance of all advances hereunder plus any accrued but unpaid interest thereon, non-interest bearing, and all other indebtedness under this Note, if not sooner paid, shall be due and payable on the Termination Date.

The outstanding principal of all advances hereunder will bear interest at the rate of interest per annum of six percent (6 %).

Interest on the outstanding principal of all advances shall be payable at the rate set forth above and shall be payable in arrears on the last day of each month commencing May 31, 2018 and on the Termination Date. Interest shall be computed on the basis of a 365-day year and actual days elapsed. Upon default or after judgment has been rendered on this Note, the unpaid principal of all advances shall, at the option of the Lender, bear interest at a rate which is 2 percentage points per annum greater than that which would otherwise be applicable.

All payments hereunder shall be applied first to the payment of interest on the unpaid principal of all advances outstanding under this Note, and then to the balance on account of the principal of all advances due under this Note.

The Lender may collect a late charge of $10 on any installment of interest or principal, or of any other amount due to the Lender which is not paid or reimbursed by the Borrower within fifteen (15) days of the due date thereof to defray the extra cost and expense involved in handling such delinquent payment and the increased risk of non-collection.

1

If at any time, the rate of interest, together with all amounts which constitute interest and which are reserved, charged or taken by the Lender as compensation for fees, services or expenses incidental to the making, negotiating or collection of any advance evidenced hereby, shall be deemed by any competent court of law, governmental agency or tribunal to exceed the maximum rate of interest permitted to be charged by the Lender to the Borrower, then, during such time as such rate of interest would be deemed excessive, that portion of each sum paid attributable to that portion of such interest rate that exceeds the maximum rate of interest so permitted shall be deemed a voluntary prepayment of principal.

The Borrower may prepay this Note, in whole or in part, at any time, without penalty or premium.

Upon the happening of any Event of Default (as defined in the Loan Agreement), all advances outstanding hereunder, together with accrued interest thereon, shall, at the option of the Lender, accelerate and become immediately due and payable and any privilege of the Borrower to take or request advances hereunder shall terminate without demand or notice of any kind. Failure to exercise such option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. This Note has been executed and delivered in accordance with a Loan and Security Agreement (as the same may be amended or modified from time to time, the "Loan Agreement") of even date herewith between the Borrower and the Lender, incorporated herein by reference, which sets forth further terms and conditions upon which the entire unpaid principal hereof and all interest hereon may become due and payable prior to the Termination Date, and generally as to further rights of the Lender and duties of the Borrower. All advances made by the Lender to the Borrower shall be evidenced by the books and records of the Lender which shall be conclusive, absent manifest error.

The Borrower agrees to pay all taxes levied or assessed upon the outstanding principal against any holder of this Note and to pay all reasonable costs, including attorneys' fees, costs relating to the appraisal and/or valuation of assets and all other costs and expenses incurred in the collection, protection, defense, preservation, or enforcement of this Note or any endorsement of this Note or in any litigation arising out of the transactions of which this Note or any endorsement of this Note is a part.

The Borrower hereby gives the Lender a lien and right of set off for all of Borrower's liabilities and obligations upon and against all the deposits, credits, collateral and property of the Borrower, now or hereafter in the possession, custody, safekeeping or control of the Lender or in transit to it. At any time, without demand or notice, and without being required to look first to any other security, the Lender may set off the same or any part thereof and apply the same to any obligation of the Borrower even though unmatured.

THE LENDER AND THE BORROWER IRREVOCABLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY PROCEEDING HEREAFTER INSTITUTED BY OR AGAINST THE LENDER OR THE BORROWER IN RESPECT OF THIS NOTE OR ARISING OUT OF ANY DOCUMENT, INSTRUMENT OR AGREEMENT EVIDENCING, GOVERNING OR SECURING THIS NOTE, INCLUDING THE AFORESAID AGREEMENT.

2

THE BORROWER (1) ACKNOWLEDGES THAT THE LOAN EVIDENCED BY THIS NOTE IS PART OF A COMMERCIAL TRANSACTION AND (2) TO THE EXTENT PERMITTED BY ANY STATE OR FEDERAL LAW, WAIVES THE RIGHT IT MAY HAVE TO PRIOR NOTICE OF AND A HEARING ON THE RIGHT OF ANY HOLDER OF THIS NOTE TO ANY REMEDY OR COMBINATION OF REMEDIES THAT ENABLES SAID HOLDER, BY WAY OF ATTACHMENT, FOREIGN ATTACHMENT, GARNISHMENT OR REPLEVIN, TO DEPRIVE THE BORROWER OF ANY OF ITS PROPERTY, AT ANY TIME, PRIOR TO FINAL JUDGMENT IN ANY LITIGATION INSTITUTED IN CONNECTION WITH THIS NOTE.

The Borrower hereby waives diligence, demand, presentment for payment, notice of nonpayment, protest and notice of protest, and notice of any renewals or extensions of this Note, and all rights under any statute of limitations, and agrees that the time for payment of this Note may be changed and extended at the Lender's sole discretion, without impairing the Borrower's liability hereon, and further consents to the release of all or any part of the security for the payment hereof at the discretion of the Lender. Any delay on the part of the Lender in exercising any right hereunder shall not operate as a waiver of any such right, and any waiver granted for one occasion shall not operate as a waiver in the event of any subsequent default.

The making of an advance at any time shall not be deemed a waiver of, or consent, agreement or commitment by the Lender to the making of any future advance to the Borrower.

If any provision of this Note shall, to any extent, be held invalid or unenforceable, then only such provision shall be deemed ineffective and the remainder of this Note shall not be affected.

This Note shall bind the heirs, executors, administrators, successors and assigns of the Borrower and shall inure to the benefit of the Lender, its successors and assigns.

This Note is secured in accordance with the terms of the Loan Agreement, the Security Agreement of even date herewith between the Lender and the Borrower, and by other security.

This Note is executed as a sealed instrument and shall be governed by and construed in accordance with the laws of the State of New Mexico.

## BORROWER:

MBF Inspection Services, Inc

By: _____

Frank Sturges, President

STATE OF NEW MEXICO                )
COUNTY OF CHAVES                      )

This instrument was acknowledged before me on this __31 st__ day of __May__ .

3

___2018___ by Frank Sturges, President of MBF Inspection Services, Inc.

_Sonia Sotelo_
Notary Public

My Commission Expires: June 25, 2019

Official Seal
SONIA SOTELO
Notary Public
State of New Mexico
My Commission Expires 6-25-19

**LENDER:**

Inspection Leasing, Inc.

By: _Mark W. Daniel_
Mark W. Daniels, President

STATE OF NEW MEXICO          )

COUNTY OF CHAVES          )

This instrument was acknowledged before me on this _31st_ day of _May_, ___2018___ by Mark W. Daniels, President of Inspection Leasing, Inc.

_Sonia Sotelo_
Notary Public

My Commission Expires: June 25, 2019

Official Seal
SONIA SOTELO
Notary Public
State of New Mexico
My Commission Expires 6-25-19

4

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:

MBF INSPECTION SERVICES INC.,

Debtor.                         Case No. 18-11579

Chapter 11

## ORDER ON EMERGENCY STIPULATED
## MOTION AUTHORIZING BORROWING

THIS MATTER came before the Court on the Debtor's Emergency Stipulated Motion for

Permission to Borrow, filed on June 20th, 2018 and Notice of Deadline to File Objections, also

filed on June 20th, 2018. The Motion requested this Court to approve the borrowing pursuant to

11 U.S.C. §364 (c). The Court, having considered the Motion and the requirements set forth in

Bankruptcy Code §364(c) Bankruptcy Rule 4001(c), and the stipulation of the parties to the

Order authorizing the borrowing, and the cash collateral Order entered on July 13th, 2018, Dkt.

no.26 and **being otherwise sufficiently advised**,

**FINDS:**

1

Exhibit C

(a)     On June 22, 2018 (the "Petition Date"), the Debtor commenced this Chapter 11 bankruptcy;

(b)     The Debtor has retained possession of its assets, as debtor-in-possession, and is continuing to operate its business;

(c)     No creditors' committee has been appointed;

(d)     The Debtor requires additional emergency funding from Inspection Leasing Inc., or it will be unable to properly continue its operation and to proceed through a contested confirmation hearing and claims paid over an extended time period, to be disbursed in accord with the terms of the Cash Collateral Order, as amended from time to time;

(e)     The notice given of the Motion and the hearing thereon was appropriate in the particular circumstances;

(f)     The requirements of Bankruptcy Code §364(c) have been satisfied.

(g)     Good cause exists for the entry of this Order and all interested parties have so agreed or have been property noticed and not objected.

It is hereby **ORDERED, ADJUDGED AND DECREED**:

1.     An Order governs the use of the borrowers pursuant to the terms of the Cash Collateral order as amended from time to time Dkt. No. 26 entered on July 13th, 2018, and the provision of adequate protection and collateralization to Inspection Leasing Inc., until entry, after a final hearing, as required for an order on its first borrowing motion but no later than October 15th, 2018. The Debtor may use the borrowed funds only to the extent and in the manner expressly permitted by this Order.

2.     Creditors Holding or Claiming Liens in Cash Collateral.     Inspection Leasing Services (ILS) holds or claim liens against collateral that may constitute cash collateral pursuant

2

Exhibit C

to 11 USC 363(a), namely account and contractor receivables and general interpolaries and their proceeds, and a priority claim only for this additional funding.

     3. Debtor's Authority to Use.

     (a) The Debtor attached to its motion, a good faith best estimate of its proposed expenses and income for reduction of the line to operate its business and administer the bankruptcy case, and closing proceeds, and Debtor requests authority to use those borrowed funds for those amounts during the period from the filing of the motion through in accordance to the Motion and this Order not to exceed $5 million dollars in accord with the Cash Collateral Order, Dkt No. 26.

     If a final order is not entered on this motion, all authority of this Debtor in regard to this borrowing shall cease coincident with the conclusion of said final hearing,

## ***END OF ORDER***

Submitted by email:

by s/ submitted by email on 12/13/16
Jennie D. Behles
B.L.F. LLC
Box 7070
Albuquerque, NM 87194-7070
(505) 242-7004
(505) 242-7066 (fax)
Attorneys for the Debtor in Possession

Approved by:

Telephonic approval
Leonard Martinez-Metzgar
United States Trustee
P.O. Box 608
Albuquerque, NM 87103
(505) 248-6544
Email: leonard.martinez-metzgar@usdoj.gov

The creditors on the list of 20 largest
Unsecured creditors filed with the
petition at the addresses set forth on such list

Louis Puccini Jr.

3

Exhibit C

Robert D. Gorman P.A.
P.O. Box 25164
Albuquerque, NM 87125-0164
Email: louis@rdgormanlaw.com
*Attorney for Inspection Services Inc.*

by: s/ filed electronically
Jennie Deden Behles

4

Exhibit C

**Recitals**

LOAN AND SECURITY AGREEMENT dated as of May 31, 2018, between Inspection Leasing, Inc., a New Mexico corporation (the "Lender") and MBF Inspection Services, Inc, a New Mexico corporation (the "Borrower").

In order to induce the Lender to advance money or grant other financial accommodations on one or more occasions to the undersigned Borrower, the undersigned Borrower represents, warrants, covenants to and agrees with the Lender as follows:

**1. Definitions**

For purposes of this Agreement, unless the context clearly requires otherwise, in addition to the terms defined elsewhere herein, the following terms shall have the meanings set forth below:

Affiliate means any person or entity which directly or indirectly controls, or is controlled by, or is under common control with the Borrower.

Agreement means this Loan and Security Agreement.

Base Rate means the interest rate announced by the Lender from time to time as its Base Rate.

Collateral means the Collateral described in the Security Agreement.

Collateral Account means the account of Borrower with the Lender established under Section 3.3 hereof.

Events of Default shall have the meaning given such term in Section 7.1 of this Agreement.

Guarantor means the Individual Guarantors and any other guarantor, endorser or surety of any obligation of the Borrower to the Lender.

Individual Guarantors means *[if any there are]* and Indebtedness means the total of all obligations of the Borrower to the Lender, whether current or long-term, including without limitation, guaranties, endorsements, or other arrangements whereby responsibility is assumed for the obligations of others.

Legal Requirements means all applicable present and future statutes, laws, ordinances, rules and regulations of any governmental authority, all orders, writs, injunctions, decrees and determinations and all covenants which bind or materially affect the Borrower or any part of its assets.

Line of Credit means the Borrower's Line of Credit with the Lender referred to in Section 2.1 hereof.

Line Note means the Borrower's Promissory Note evidencing indebtedness for the Line of Credit.

Loan Account means the accounting as to the Loans by the Lender pursuant to Section 2.2 hereof.

Loan Documents means the following documents collectively:

(i) This Agreement;

(ii) Each Promissory Note of the Borrower to the Lender, including the Line Note (collectively the "Notes") evidencing the indebtedness for the Loan;

(iii) All other documents and instruments heretofore or hereafter executed by the Borrower, or any Guarantor in favor of the Lender relating to the Loans including any guaranty, pledge, security or subordination agreement and related Uniform Commercial Code financing statements; and

(iv) In each case, the term "Loan Documents" and any reference herein to any particular Loan Document shall mean and include all amendments, modifications, replacements, renewals or extensions of any and all such documents whenever executed.

1

Loans means:

(i) The Line of Credit evidenced by the Line Note; and

(ii) Any other loans made by the Lender to the Borrower after the date of this Agreement.

Obligations means all liabilities and obligations now or hereafter owing from the Borrower to the Lender of whatever kind or nature, whether or not currently contemplated at the time of this Agreement, whether such obligations be direct or indirect, absolute or contingent or due or to become due, including all obligations of the Borrower, actual or contingent, in respect of letters of credit or Lender's acceptances issued by the Lender for the account of or guaranteed by the Borrower, including without limitation the guarantees of the Individual Guarantors, and all obligations of any partnership or joint venture as to which the Borrower is or may become liable, which term shall include all accrued interest and all costs and expenses, including reasonable attorneys' fees, costs and expenses relating to the appraisal and/or valuation of assets and all reasonable costs and expenses incurred or paid by the Lender in exercising, preserving, defending, collecting, enforcing or protecting any of its rights under the Obligations or in any litigation arising out of the transactions evidenced by the Obligations.

Required Permits means all permits, licenses, approvals, consents and waivers necessary pursuant to any Legal Requirement to be obtained from or made by any governmental authority for the ownership by the Borrower of its assets or for the conduct of its business.

Termination Date shall have the meaning set forth in Section 2.1 hereof.

## 2. Loans

### 2.1. Line of Credit

(a) Line of Credit. Pursuant to this Agreement and upon satisfaction of the conditions precedent in Section 5 hereof, during the period from the date hereof until the first anniversary hereof (as such date may be extended in writing from time to time, in the Lender's sole and absolute discretion, the "Termination Date"), the Lender shall make advances under the Line of Credit and the Borrower may borrow, repay and reborrow under the Line of Credit; provided, however, that the aggregate amount of all advances at any one time outstanding shall not exceed $5,000,000.00.

(b) Line of Credit Advances. All advances under the Line of Credit shall be evidenced by the Line Note, shall bear interest and prepayment premiums thereunder and shall be due and payable in full on the Termination Date.

### 2.2. Loan Account

(a) The Lender shall maintain an accounting (the "Loan Account") on its books to record: (i) all Loans; (ii) all payments made by the Borrower; and (iii) all other appropriate debits and credits as provided in this Agreement with respect to the Obligations. All entries in the Loan Account shall be made in accordance with the Lender's customary accounting practices as in effect from time to time. Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by the Lender from or on behalf of Borrower, and the Borrower hereby irrevocably agrees that the Lender shall have the continuing exclusive right to apply and to reapply any and all payments received at any time or times after the occurrence and during the continuance of an Event of Default against the Obligations in such manner as the Lender may deem advisable.

(b) The balance in the Loan Account, as set forth on the Lender's most recent printout or other written statement, shall be presumptive evidence of the amounts due and owing to the Lender by Borrower; provided, however, that any failure to so record or any error in so recording shall not affect the payment of the Obligations. Any periodic statement prepared by the Lender setting forth the principal balance of the Loan Account and the calculation of interest due thereon shall be subject to subsequent adjustment by the Lender but shall, absent manifest errors or omissions, be presumed final, conclusive and binding upon the Borrower, and shall constitute an account stated unless within 15 days after receipt of such statement, the Borrower shall deliver to the Lender its written objection thereto specifying the error or errors, if any, contained in such statement. In the absence of a written objection delivered to the Lender as set forth above, the Lender's statement of the Loan Account shall be presumptive

evidence against the Borrower of the amount of the Obligations and the burden of proof to show manifest errors or omissions shall be on the Borrower.

## 3. Representations and Warranties

The Borrower hereby represents and warrants to the Lender (which representations and warranties will survive the delivery of this Agreement and the making of any advances of any Loan and shall be deemed to be continuing until all Loans are fully paid and this Agreement is terminated) that:

(a) (i) The Borrower is and will continue to be, duly organized and validly existing; the Borrower is in good standing under the laws of the State of New Mexico; (ii) the Borrower is qualified and in good standing to do business in all other jurisdictions in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary; (iii) the Borrower has the power to execute and deliver this Agreement and each other Loan Document and to borrow hereunder; and (iv) the Borrower has all Required Permits without unusual restrictions or limitations, to own, operate and lease its properties and to conduct the business in which it is presently engaged, all of which are in full force and effect.

(b) The making and performance by the Borrower of this Agreement and the Loan Documents have been authorized by all necessary corporate action by its general partner. The execution and delivery of this Agreement and the other Loan Documents, the consummation of the transactions herein and therein contemplated, the fulfillment of or compliance with the terms and provisions hereof and thereof, (i) are within its powers, (ii) will not violate any provision of law or of its organizational documents, or (iii) will not result in the breach of, or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any property or assets of the Borrower pursuant to any indenture or Lender loan or credit agreement (other than pursuant to this Agreement and the other Loan Documents) or other agreement or instrument to which the Borrower is a party. To the Borrower's knowledge, no approval, authorization, consent or other order or registration or filing with any governmental body is required in connection with the making and performance of this Agreement.

(c) This Agreement and all other Loan Documents, upon the execution and delivery thereof, will be legal, valid, binding and enforceable obligations of the Borrower or the person executing the same, as the case may be, in accordance with the terms of each; provided, however, that the Borrower's representation as to enforceability is qualified to the extent that enforcement of the rights and remedies created by this Agreement and the Loan Documents may be subject to applicable Lender bankruptcy, insolvency, reorganization or similar laws affecting the rights of creditors and secured parties generally, and does not apply with respect to the availability of the remedy of specific performance, injunctive relief or any other equitable remedy.

(d) The Borrower conducts its business solely in its own name without the use of a trade name or the intervention of or through any other entity of any kind, except it may collect through its Lender, Inspection Leasing Inc. All books and records relating to the assets of the Borrower are located at the Borrower's chief executive office and its other places and locations, where its assets are located.

## 4 . *Conditions to Every Advance*

In addition to all other conditions contained in this Agreement, every advance under the Line of Credit shall be subject to the following conditions precedent that:

(a) No Event of Default. No Event of Default has occurred and no event shall have occurred or be continuing which, pursuant to the provisions of Section 8, with the lapse of time and/or the giving of a notice as specified therein, would constitute an Event of Default.

(b) No Material Adverse Change. There shall have been no material adverse change (as determined by the Lender) in the assets, liabilities, financial condition or business of the Borrower or any Guarantor since the date of any financial statements delivered to the Lender before or after the date of this Agreement.

3

(c) Representations and Warranties. That the representations and warranties contained in Section 4 hereof and in each other Loan Document shall be true and correct in all material respects. Any request for a borrowing shall be deemed a certification by the Borrower as to the truth and accuracy in all material respects of the representations and warranties contained in Section 4 hereof and in each other Loan Document as of the date of such request.

## 5. Affirmative Covenants

The Borrower covenants and agrees that from the date hereof until payment in full of all Loans and the performance of all Borrower's obligations hereunder and under all other Loan Documents is complete and this Agreement shall have terminated, unless the Lender otherwise consents in writing, the Borrower shall:

(a) Comply with all terms and conditions of this Agreement and the other Loan Documents and pay all material debts of the Borrower before the same shall become delinquent.

(b) (i) Keep its properties insured against fire and other hazards (so called "All Risk" coverage) in amounts and with companies satisfactory to the Lender to the same extent and covering such risks as is customary in the same or a similar business, but in no event in an amount less than the full insurable value thereof, which policies shall name the Lender as loss payee as its interest may appear, (ii) maintain public liability coverage against claims for personal injuries or death, and (iii) maintain all worker's compensation, employment or similar insurance as may be required by applicable law. Such All Risk property insurance coverage shall provide for a minimum of 15 days written notice to the Lender of cancellation or modification. The Borrower agrees to deliver copies of all of the aforesaid insurance policies to the Lender. In the event of any loss or damage to any of its assets, including any collateral securing any Loan, the Borrower shall give prompt written notice to the Lender and to Borrower's insurers of such loss or damage and shall promptly file proofs of loss with said insurers.

(c) Maintain its chief executive office, principal places of business and locations of assets at the locations set forth in this Agreement. The Borrower shall promptly give the Lender written notice of any change in any of such addresses. All business records of the Borrower, including those pertaining to all Accounts and contract rights, shall be kept at the said chief executive office of the Borrower, unless prior written consent of the Lender is obtained to a change of location.

## 6. Negative Covenants

Unless the Lender consents in writing, the Borrower covenants and agrees it shall not:

(a) Create or incur any Indebtedness for borrowed money, become liable, either actually or contingently, in respect of letters of credit or Lender's acceptances or issue or sell any obligations of the Borrower, excluding, however, from the operation of this covenant the Loans hereunder and all other Obligations of the Borrower to the Lender.

(b) Sell, lease, pledge, transfer or otherwise dispose of all or any of its assets (other than the disposition of inventory in the ordinary course of its business as presently conducted or the sale of obsolete equipment or equipment no longer usable in the conduct of the Borrower's business), whether now owned or hereafter acquired except for liens or encumbrances required or permitted hereby or by any Loan Document.

(c) Assume, guarantee, endorse or otherwise become liable upon the obligations of any person, firm or corporation or by the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business.

(d) Allow any business or activity to be conducted on real property owned or occupied by the Borrower that uses, manufactures, treats, stores or disposes of any toxic substances, oil or hazardous wastes which are prohibited or regulated pursuant to any Legal Requirement, except in full compliance therewith and with all Required Permits,

4

or which are contrary to the provisions of any insurance policy.

## 7. Events of Default; Remedies

### 7.1. Events of Default

The occurrence of any of the following events, for any reason whatsoever, shall constitute an "Event of Default" hereunder:

(a) (i) Failure to make due payment of principal or interest on any Loan provided such failure continues for a period of 15 business days or (ii) failure by the Borrower, any Affiliate, or any Guarantor to make due payment of any other liability or obligation owing by the Borrower, any Affiliate or any Guarantor to the Lender, now existing or hereafter incurred, whether direct or contingent (herein, "Other Lender Debt"), provided such failure continues for a period of 15 business days; or

(b) Failure by the Borrower or any Guarantor to observe or perform any covenant contained in (i) this Agreement, or any of their respective obligations under any other Loan Document or (ii) any document or instrument evidencing, securing or otherwise relating to any Other Lender Debt provided that if said failure is curable, it continues for a period of 15 days; or

(c) Any representation or warranty made by the Borrower or any Guarantor to the Lender or any statement, certificate or other data furnished by any of them in connection herewith or with any other Loan Document proves at any time to be incorrect in any material respect; or

(d) A judgment or judgments for the payment of money shall be rendered against the Borrower or any Guarantor which shall remain unsatisfied and in effect for a period of 15 days without a stay of execution; or

(e) Any levy, seizure, attachment, execution or similar process shall be issued or levied on any of the Borrower's or any Guarantor's property, which such process could have a material adverse effect on the business of the Borrower in the Lender's reasonable judgment; or

(f) Failure by the Borrower or by any Guarantor to pay or perform any other Obligation whether contingent or otherwise, or if any such other Obligation shall be accelerated, or if there exists any event of default under any instrument, document or agreement governing, evidencing or securing such other Obligation; or

(g) The Lender reasonably believes that any material adverse change in the assets, liabilities, financial condition or business of the Borrower or any Guarantor has occurred since the date of any financial statements delivered to the Lender before or after the date of this Agreement; or

(h) The Borrower sells, liquidates, transfers or otherwise disposes of an asset not in strict accordance with the terms of this Loan Agreement; or

(i) If at any time the Lender reasonably believes in good faith that the prospect of payment of any Obligation or the performance of any agreement of the Borrower or any Guarantor is materially impaired, or that there is such a change in the assets, liabilities, financial condition or business of the Borrower or any Guarantor as the Lender believes in good faith materially impairs the Lender's security or increases its risk of non-collection.

### 7.2. Remedies

(a) Upon the occurrence of any Event of Default and at any time thereafter, the availability of advances hereunder and under the Line of Credit shall, at the option of the Lender, be deemed to be automatically terminated and the Lender, at its option, may declare one or more or all of the Loans outstanding hereunder, together with accrued interest thereon and all applicable late charges and surcharges and all other liabilities and obligations of the Borrower to the Lender to be forthwith due and payable, whereupon the same shall become forthwith due and

5

payable; all of the foregoing without presentment or demand for payment, notice of non-payment, protest or any other notice or demand of any kind, all of which are expressly waived by the Borrower and by each Guarantor.

## 8. Miscellaneous

### 8.1. Joint and Several Obligations; Certain Waivers

(a) This Agreement shall be the joint and several obligation of the Borrower and each Guarantor and each provision of this Agreement shall apply to each and all jointly and severally and to the property and liabilities of each and all, all of whom hereby waive diligence, demand, presentment for payment, notice of nonpayment, protest and notice of dishonor, and who hereby agree to any extension or delay in the time for payment or enforcement, to renewal of any Loan and to any substitution or release of any Collateral or any Guarantor, all without notice and without any effect on their liabilities. Any delay on the part of the Lender in exercising any right hereunder or under any other Loan Document which may secure any Loan shall not operate as a waiver of any such right, and any waiver granted for one occasion shall not operate as a waiver in the event of a subsequent default. The Lender may revoke any permission or waiver previously granted to Borrower or any Guarantor, such revocation to be effective prospectively when given whether given orally or in writing. The rights and remedies of the Lender shall be cumulative and not in the alternative, and shall include all rights and remedies granted herein, in any other Loan Document and under all applicable laws.

(b) THE LENDER, THE BORROWER AND EACH GUARANTOR IRREVOCABLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY PROCEEDING HEREAFTER INSTITUTED BY OR AGAINST THE LENDER, THE BORROWER OR ANY GUARANTOR IN RESPECT OF THIS AGREEMENT, THE NOTES OR ANY OTHER LOAN DOCUMENT.

(c) THE BORROWER AND EACH GUARANTOR (i) ACKNOWLEDGE THAT THE TRANSACTION OF WHICH THIS AGREEMENT IS A PART IS A COMMERCIAL TRANSACTION AND (ii) TO THE EXTENT PERMITTED BY ANY STATE OR FEDERAL LAW, WAIVE THE RIGHT ANY OF THEM MAY HAVE TO PRIOR NOTICE OF AND A HEARING ON THE RIGHT OF ANY HOLDER OF THE NOTES, OR ANY OF THEM, TO ANY REMEDY OR COMBINATION OF REMEDIES THAT ENABLES SAID HOLDER, BY WAY OF ATTACHMENT, FOREIGN ATTACHMENT, GARNISHMENT OR REPLEVIN, TO DEPRIVE THE BORROWER OR ANY GUARANTOR OF ANY OF THEIR PROPERTY, AT ANY TIME, PRIOR TO FINAL JUDGMENT IN ANY LITIGATION INSTITUTED IN CONNECTION WITH THIS AGREEMENT.

### 8.2. Notices

All notices, requests or demands to or upon a party to this Agreement shall be given or made by the other party hereto in writing, in person or by depositing in the mails postage prepaid, return receipt requested addressed to the addressee at the address set forth herein as the Borrower's chief executive office or to such other addresses as such addressee may have designated in writing to the other party hereto. No other method of giving any notice, request or demand is hereby precluded.

### 8.3. Expenses; Additional Documents

The Borrower will pay all taxes levied or assessed upon the principal sum of the advances made against the Lender, all fees of the Lender for its Lock-Box services and all other fees provided herein, and all expenses arising out of the preparation, amendment, waiver, modification, protection, collection and/or other enforcement of this Agreement, or any other Loan Document, or of any Collateral or security interest now or hereafter granted to secure the Loans or mortgage, security interest or lien granted hereunder or under any other Loan Document (including, without limitation, attorneys' fees). The Borrower will, from time to time, at its expense, execute and deliver to the Lender all such other and further instruments and documents and take or cause to be taken all such other and future action as the Lender shall request in order to effect and confirm or vest more securely all rights contemplated by this Agreement or any other Loan Document.

### 8.4. Governing Law; Consent to Jurisdiction

This Agreement, the other Loan Documents and the rights and obligations of the parties hereunder and thereunder shall be construed and interpreted in accordance with the laws of *[New Mexico]*. The Borrower and each Guarantor

6

agree that the execution of this Agreement and the other Loan Documents and the performance of the Borrower's and Guarantor's obligations hereunder and thereunder shall be deemed to have a *[New Mexico]* situs and the Borrower and each Guarantor shall be subject to the personal jurisdiction of the courts of *[New Mexico]* with respect to any action the Lender or its successors or assigns may commence hereunder or thereunder. Accordingly, the Borrower and each Guarantor hereby specifically and irrevocably consent to the jurisdiction of the courts of *[New Mexico]* with respect to all matters concerning this Agreement, the other Loan Documents, the Notes or the enforcement of any of the foregoing.

### 8.5. Survival of Representations

All representations, warranties, covenants and agreements herein contained or made in writing in connection with this Agreement shall survive the execution and delivery of the Loan Documents and shall continue in full force and effect until all amounts payable on account of all Loans, the Loan Documents and this Agreement shall have been paid in full and this Agreement has been terminated.

### 8.6. Integration; Severability; Successors

This Agreement is the final, complete and exclusive statement of the terms governing this Agreement. If any provision of this Agreement shall to any extent be held invalid or unenforceable, then only such provision shall be deemed ineffective and the remainder of this Agreement shall not be affected. The provisions of this Agreement shall bind the heirs, executors, administrators, assigns and successors of the Borrower and each Guarantor and shall inure to the benefit of the Lender, its successors and assigns.

### 8.7. Determinations as to Compliance

All documents and assurances of any type related to the fulfillment of any condition or compliance with any provision hereof or of any other Loan Document and all other matters related to the Loans are subject to the prior approval and satisfaction of the Lender, its counsel and other consultants.

### 8.8. Termination of this Agreement

This Agreement shall terminate upon the written agreement of the parties hereto to the termination of any privilege of the Borrower to take advances under the Line of Credit and full and final payment of all amounts with respect to all Loans or otherwise due hereunder and under the other Loan Documents.

IN WITNESS WHEREOF, the undersigned executes this Agreement as an instrument under seal as of the date first set forth above.

ACCEPTED AND AGREED:

By: _____

MBF Inspection Services, Inc.
Frank Sturges
Title:  President

ACCEPTED AND AGREED:

By: _____

Inspection Leasing, Inc.
Mark W. Daniels
Title: President

7